UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FAYEZ DAHLEH,<br>      Plaintiff<br><br>    v.<br><br>MINNESOTA LIFE INSURANCE<br>COMPANY,<br>      Defendant | No. 22 CV 6771<br><br>Judge Jeremy C. Daniel |

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiff Fayez Dahleh's partial motion for summary judgment and Defendant Minnesota Life Insurance Company's ("Minnesota Life") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (R. 34; R. 37.)[1] For the following reasons, Dahleh's motion is denied and Minnesota Life's motion is granted.

### BACKGROUND[2]

On January 10, 2012, Minnesota Life issued life insurance policy number 2576223W (the "Policy") with a face value of $707,612 on Gilda Perlas'[3] life. (R. 46, Plaintiff's Response to Defendant's Statement of Material Facts ("Pl.'s Resp. to Def.'s SOF") ¶¶ 1, 6.) Perlas was identified as the "Owner" of the Policy in the initial

---

[1] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.
[2] The following facts are taken from the parties' Local Rule 56.1 submissions, the materials cited therein, and other aspects of the record in this case. All facts are genuinely undisputed unless otherwise noted.
[3] Perlas is not a party to this action.

application, and she selected an annual planned premium payment amount of $60,000. (*Id.* ¶ 7; R. 36-1, Exhibit 3 ("Ex. 3") at 3.) Perlas originally designated her husband as the primary beneficiary and her daughter and son as the contingent beneficiaries. (Pl.'s Resp. to Def.'s SOF ¶ 6; Ex. 3 at 2.)

Under the Policy, the net premiums paid become part of the Policy's "accumulation value." (R. 40-4 ("Policy") at 13.) Minnesota Life billed monthly account fees on the Policy that were deducted from the Policy's accumulation value. (Pl.'s Resp. to Def.'s SOF ¶ 15; Policy at 19 ("'[A]ccumulation value' is the aggregate amount of premiums paid by the insured, less outstanding charges[.]").) If the accumulation value ever became insufficient to cover these monthly fees, the Policy requires that the insured "pay premiums during this grace period to cover the insufficiency and continue your policy in force beyond the grace period." (Policy at 22.) Otherwise, "[i]f the payment is not paid by the end of the grace period, [the] policy will terminate." (*Id.*) The accumulation value is also available during the insured's lifetime to use as collateral for a loan or as a policy loan. (*Id.* at 13.) According to the Policy, policy loans are "a valuable feature" and require "careful[] monitoring," because "if the interest on a policy loan . . . grow[s] until it exceeds your accumulation value," the policy will terminate. (R. 36-1, Exhibit 5 ("Ex. 5") at 87; Policy at 23 ("Your policy will remain in force so long as the accumulation value less the sum of the policy loan and any unpaid policy loan interest is sufficient to cover the monthly charges. Otherwise, your policy will terminate.").)

2

On March 14, 2014, Perlas took out a policy loan of $73,796.75. (Ex. 5 at 12; Def.'s Resp. to Pl.'s SOF ¶ 19.) The loan had a fixed interest rate of four percent. (*Id.*) Also, effective June 30, 2017, Perlas made a premium billing change to the Policy, making the planned annual premium payment $0. (Pl.'s Resp. to Def.'s SOF ¶ 30.)

On July 31, 2019, Perlas transferred ownership of the Policy to her creditor, Dahleh. (*Id.* ¶ 35; R. 40-14 at 1.) Dahleh also became the beneficiary of the account, and his sons replaced Perlas' husband and children as contingent beneficiaries. (Pl.'s Resp. to Def.'s SOF ¶ 36.) After Dahleh became the account owner, the loan balance continued to grow; this was because the accumulation value declined due to accruing monthly charges, and the planned annual premium payment had previously been adjusted to $0. For instance, the 2020 Annual Policy Review states that the accumulation value was $79,752.12 and the loan balance was $79,126.87. (Ex. 5 at 60–63; R. 39, Defendant's Response to Plaintiff's Statement of Facts ("Def.'s Resp. to Pl.'s SOF") ¶ 45.) The 2021 Annual Policy Review states that the Policy's accumulation value was $81,832.56 and the loan balance was $79,193.17 (Ex. 5 at 72–75; Def.'s Resp. to Pl.'s SOF ¶ 45.)

On February 10, 2021, Minnesota Life mailed Dahleh a Required Payment Notice stating that the accumulation value was insufficient to cover the monthly charges and a minimum premium payment of $4,586.95 and a minimum loan payment of $801.75 were required. (Defendant's Response to Plaintiff's Statement of Additional Facts ("Def.'s Resp. to Pl.'s SOAF") ¶¶ 2–3; Policy at 14 (defining "initial minimum premium" as "[t]he amount of premium required to put the policy in force"

3

and "the monthly initial minimum premium shown on the policy data pages multiplied by three (3) months[.]"). Dahleh made a corrective payment within the sixty-one-day grace period. (Def.'s Resp. to Pl.'s SOAF ¶¶ 2–3.) This process, *i.e.*, Minnesota Life sending Dahleh a Required Payment Notice identifying the minimum premium and loan payments to avoid any deficiency in the accumulation value, occurred again on June 10 and September 10, 2021. (*Id.* ¶¶ 4–9.) Dahleh made corrective payments within the grace period in both instances. (*See id.*)

When the accumulation value fell below the monthly charges again, on December 10, 2021, Minnesota Life mailed Dahleh another notice of insufficiency, with a grace period that ended on February 9, 2022. (Pl.'s Resp. to Def.'s SOF ¶ 59; R. 40-35 ("Required Payment Notice") at 1. On January 9, 2022, Minnesota Life mailed Dahleh a nearly identical Required Payment Reminder Notice. (Pl.'s Resp. to Def.'s SOF ¶ 63; R. 40-36 ("Required Payment Reminder Notice") at 1.) No payment was received within the grace period. (Pl.'s Resp. to Def.'s SOF ¶ 67.)

On the day the grace period ended, Minnesota Life mailed Dahleh a Policy Termination notice that stated the Policy was "terminated effective 02/09/2022." (R. 40-38 at 1; Pl.'s Resp. to Def.'s SOF ¶ 69.) It further provided that, "[w]e recently notified you of the required payment to keep your policy active. We have yet to receive payment; therefore, your policy has been terminated." (*Id.*)

On February 20th Dahleh emailed a Minnesota Life representative inquiring whether payment could be made on the Policy. (Def.'s Resp. to Pl.'s SOF ¶ 53.) The representative replied that "[a]s of 2/9/2022 the policy has lapsed." (*Id.* ¶ 54.) The

4

representative further stated that "[i]n order to get the policy reinstated [Perlas] [needed] to go through underwriting to see if she [could] be approved for reinstatement." (*Id.*) In its Underwriting Decision, Minnesota Life reported that it was "unable to reinstate Standard coverage." (*Id.* ¶ 56.)

Dahleh thereafter filed this suit against Minnesota Life seeking a declaratory judgment that the Policy is still in full force and effect. (R. 31.)[4] Dahleh and Minnesota Life have filed cross motions for summary judgment. (R. 34; R. 37.)

## LEGAL STANDARD

"With cross summary judgment motions, [the Court] construe[s] all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *Markel Ins. Co. v. Rau*, 954 F.3d 1012, 1016 (7th Cir. 2020). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it is one identified by the law as affecting the outcome of the case." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 722 (7th Cir. 2015). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ANALYSIS

The cross-motions dispute whether the Policy remained in force when Dahleh sought to tender payment on February 20th. Minnesota Life contends that it correctly

---

[4] The Court has subject matter jurisdiction over this dispute based on diversity of citizenship.

5

rejected this payment because the Policy terminated by its terms on February 9th, at the end of the sixty-one-day grace period for making a payment. (R. 38 at 3.) Dahleh, however, argues that the Policy was in force because Minnesota Life was prohibited, as a matter of law, from declaring the policy lapsed because his attempted payment was within the six-month statutory grace period set forth in 215 ILCS 5/234 ("section 234"), and Minnesota Life failed to provide sufficient notice as the statute required. (R. 35 at 9–14.)

In Illinois, the "[d]eclaration of lapse of a life insurance policy is controlled by section 234 of the Illinois Insurance Code." *Cullen v. N. Am. Co.*, 531 N.E.2d 390, 392 (Ill. 1988). Section 234 "requires a life insurance carrier to provide notice of an overdue premium to a policyholder before the company can lawfully cancel a policy." *Hotaling v. Chubb Sovereign Life Ins. Co.*, 241 F.3d 572, 579 (7th Cir. 2001). "If an insurer does not comply with section 234's notice requirements, then the six-month grace period applies." *Olas v. ReliaStar Life Ins. Co.*, 712 F. Supp. 3d 1086, 1091 (N.D. Ill. 2024).

I. SECTION 234 APPLIES TO THE POLICY.

"Before determining whether [Minnesota Life] complied with section 234's notice requirements, the Court must first address whether the statute applies at all." *Id.* Minnesota Life argues that the Policy had no planned premium payments and so section 234 does not apply. (R. 38 at 13.) Dahleh claims section 234 applies because Minnesota Life "billed for three months at a time." (R. 35 at 10–11.) Both parties are incorrect; proper statutory interpretation and consideration of the Policy shows that the premiums were payable annually—and that is why section 234 applies.

6

When interpreting any statute, the Court considers its plain and ordinary meaning, based on "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole[.]" *Emergency Servs. Billing Corp. v. Allstate Ins. Co.*, 668 F.3d 459, 465 (7th Cir. 2012). Here, two portions of section 234 are key for determining its applicability. First, the statute explicitly applies to policies which lapse "by reason of nonpayment when due of any premium, . . . required by the terms of the policy to be paid." Section 234(1). Second, the statute is not applicable to "any policies upon which premiums are payable monthly or at shorter intervals." Section 234(2).

The Policy does not define premium or due and there is nothing to suggest that the ordinary meaning does not apply. If, as here, "[t]here is nothing to suggest that a premium is a special kind of payment, as opposed to other less-special payments," then "when a payment is required to maintain an insurance policy, and when making that payment is sufficient to maintain the policy for some period without requiring some additional payment, it qualifies as a premium under that term's common meaning." *Cooke v. Jackson Nat'l Life Ins. Co.*, 243 F. Supp. 3d 987, 996 (N.D. Ill. 2017), *rev'd on diff. grounds*, 919 F.3d 1024 (7th Cir. 2019). Further, payable means the insured's choice of payment frequency. *Olas*, 712 F. Supp. 3d at 1091 (concluding that section 234 applied where the plaintiff's elected payment frequency was semi-annual); *Cooke*, 243 F. Supp. 3d at 1004–05 (explaining that while "[the insured] was satisfying his premiums by paying on a monthly basis, Section 234 [did] not apply" but that it did "after [the insured's] . . . demand for a quarterly premium.").

7

Accordingly, the Court concludes that section 234 applies to policies that are declared lapsed because of a neglect or failure to pay a sum that an insured is required to pay to keep their policy in effect. *See also Cooke*, 243 F. Supp. 3d at 1005 ("Boiled down to its essence, the statute mandates that: (1) if a policy's premiums are not payable monthly, (2) the insurer cannot terminate the policy for defaulted premium payments within six months, (3) unless it sent the proper notice 15 to 45 days earlier.").

Additionally, because this dispute concerns a life insurance policy, "the normal rules of contract interpretation apply." *Citizens Ins. Co. of Am. v. Wynndalco Enterprises, LLC*, 70 F.4th 987, 995 (7th Cir. 2023). "The primary goal is to ascertain and give effect to intentions of parties as expressed in the policy language." *Id.* The Court "construe[s] the individual provisions of the policy not in isolation but as a whole, giving effect to each and every provision whenever possible." *Id.* Absent ambiguity, the Court accords the contract terms "their ordinary meanings and appl[ies] the policy language as written, so long as doing so would not conflict with public policy." *Id.* Although ambiguities typically favor the insured, "[a] court should not search for ambiguity where none exists." *River v. Commercial Life Ins. Co.*, 160 F.3d 1164, 1169 (7th Cir. 1998).

Here, when Perlas obtained the Policy, she elected for annual premium payments, (Policy at 30), and so section 234's statutory language and principles of contract interpretation support concluding that the notice provision applies. Specifically, the Policy falls within section 234(1) because Minnesota Life declared the Policy lapsed due to nonpayment. (Pl.'s Resp. to Def.'s SOF ¶ 69; Def.'s Resp. to

8

Pl.'s SOF ¶¶ 53–54.) And the Policy does not fall into the exception set forth in section 234(2) because, despite the transfer of the Policy's ownership and Perlas changing her planned premium amount to $0, no change was ever made to Perlas' annual premium payment election; thus, the Policy was not payable monthly or less frequently. (Pl.'s Resp. to Def.'s SOF ¶¶ 7, 30, 35.)

## II. THE NOTICES COMPLIED WITH SECTION 234.

Now, the question becomes whether Minnesota Life complied with section 234's notice requirements. Because no reasonable juror could conclude that the notices mailed to Dahleh failed to "adequately alert[] policyholders to the consequences of nonpayment," Minnesota Life is entitled to summary judgment. *Levy v. W. Coast Life Ins. Co.*, 44 F.4th 621, 628 (7th Cir. 2022).

"It is clear from the use of the word 'shall' in Section []234 that it is mandatory for an insurer to give the required notice in order to validly declare an insurance policy forfeited or lapsed." *Wegrzyn v. Jackson Nat. Life Ins. Co.*, No. 10 C 2140, 2011 WL 2672510, at *3 (N.D. Ill. July 8, 2011) (quoting 215 ILCS 5/234(1)). The written notice must "stat[e] the amount of such premium, installment, interest or portion thereof due on such policy, the place where it shall be paid and the person to whom the same is payable[.]" 215 ILCS 5/234(1). It must also "state that unless such premium or other sums due shall be paid to the company or its agents the policy and all payments thereon will become forfeited and void, except as to the right to a surrender value or paid-up policy as provided for by the policy." *Id.* As the insurance provider, it is Minnesota Life's burden to convince this Court that its notices were adequate. *Cooke*, 243 F. Supp. 3d at 1005 n. 13.

9

Here, the Required Payment Notice and Required Payment Reminder Notice ("the notices") Minnesota Life mailed to Dahleh provided that:

> This is a reminder of the payment required *to prevent your policy from terminating*, as there is insufficient accumulation value for monthly charges. This required amount includes both a premium and loan payment. It will be applied to your policy as noted below on the Required Payment Return slip. You have a 61-day grace period for payment to be made. The grace period ends on 02/09/2022. *If the total amount due is not received by 02/09/2022, the end of the 61-day grace period, the policy will terminate*, except as to the right to any cash surrender value or nonforfeiture benefit. If you have recently received a loan interest bill, please note that loan interest amount is also included in this bill. Your regular billing, group billing, or automatic payment withdrawals have been stopped; direct billing to the policyowner will resume if payment is received. Return the lower portion with your payment. We accept checks as payment; your canceled check is your receipt. *Your payment will not be accepted after the grace period.* If a policy terminates, a reinstatement application and satisfactory evidence of insurability is required to reinstate; please refer to your policy for more details. Your policy allows for a reduction of the face amount of the policy as an option to retain coverage.

(*See, e.g.*, Required Payment Notice at 1 (emphasis added).)

The amount due, who to pay, Minnesota Life, and their mailing address is set forth at the top and bottom of the notices. (*See id.*) Still, Daleh argues that the notices were insufficient because they omit the "forfeited and void" statutory language. (R. 35 at 11–12.) Minnesota Life argues that the omission of this language is immaterial because the notices "conveyed the payment information and the consequences of non-payment as contemplated by [section 234]." (R. 38 at 15–16.)

The Court agrees with Minnesota Life that the notices were sufficient because they unambiguously explain the consequences of nonpayment. Indeed, a notice is

sufficient if it follows the statute "almost verbatim." *Levy*, 44 F.4th at 627 (concluding that a notice, which stated that the insurance policy would "become forfeited and void, except as to the right, if any, to a surrender value, paid-up policy, or nonforfeiture benefit as may be provided for by the policy," was sufficient). Although the notices here did not state that the Policy would be "forfeited and void," no reasonable juror could conclude that the notices are susceptible to any other meaning. *See Epstein v. Yoder*, 391 N.E.2d 432, 438 (Ill. App. Ct. 1979) ("[A]n ambiguity exists where language is susceptible to different construction."). Rather, when the notices' disclosures that "[i]f the total amount due is not received by 02/09/2022, the end of the 61-day grace period, the policy will terminate," are considered in light of the Policy, which defines terminate as "the insured's life is no longer insured under any of the terms of the Policy" it is evident that the notices sufficiently convey the consequences of nonpayment. (Policy at 15.)

The Policy's definition of "terminate" makes this case distinguishable from *Harwick v. AXA Equitable Life Insurance Company*, No. 19 C 8305, 2020 WL 7698367, at *2 (N.D. Ill. Dec. 27, 2020), on which Dahleh relies. (*See* R. 35 at 12–13.) In *Harwick*, as here, "[t]he parties dispute[d] whether an insurer that does not give notice using the exact language set out in section 234(1) is precluded from declaring a policy forfeited or lapsed following a missed premium payment." *Id.* The court did not answer this question, however, because it concluded that the notice provided was ambiguous. *Id.* Similar to the notices here, the notice in *Harwick* said that "[i]f a premium is not paid by the end of the grace period the policy will terminate." *Id.*

11

While acknowledging that "terminates" "certainly indicate[s] the possibility of some negative consequence," the court asked "what . . . it mean[s] for a policy to terminate"—a question easily answered, here, by looking to the Policy. *Id.*

Yet, in *Harwick*, without analyzing whether terminate was defined by the underlying policy at issue, and because the notice did not define terminate, the court looked to the language immediately following the word "terminate." *Id.* The court reasoned that the notice's inclusion of the phrase "*except for any continuing insurance benefits that may be provided* by any cash value under the policy or *by law*" immediately following terminate "effectively took away, or at least rendered seriously ambiguous, any negative consequence conveyed by the language that [the defendant-life insurer] used." *Id.* at *3 (emphasis in original). Distinguishably, here, the language appearing immediately after the nonpayment disclosure does not undermine its meaning; rather, it tracks the statutory language. *Compare* Required Payment Reminder Notice at 1 ("except as to the right to any cash surrender value or nonforfeiture benefit"), *with* Section 234(1) ("except as to the right to a surrender value or paid-up policy as provided for by the policy").

The Court's holding that the notices were adequate is also consistent with section 234's broader context. The purpose of section 234 is "to provide a warning to the insured so that the insurance company cannot 'keep [ ] silent and induce the insured to forget to pay the premium.'" *Clarin Corp. v. Mass. Gen. Life Ins. Co.*, 44 F.3d 471, 477 (7th Cir. 1994) (citation omitted). Here, Minnesota Life did not keep silent to induce Dahleh to forget to pay. Rather, each time the Policy's accumulation

12

value fell below the monthly charges, Dahleh was notified that the Policy was at risk of termination. That Dahleh paid the required sum to keep the Policy active in February, June, and September 2021 within the grace period evidences that the notices sufficiently apprised him as to the consequences of nonpayment. Accordingly, the Court concludes that the notices sufficiently complied with section 234's requirements; Minnesota Life's motion for summary judgment is granted and Dahleh's motion for summary judgment is denied.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, Minnesota Life's motion for summary judgment [37] is granted and Dahleh's [34] is denied.

Date: January 27, 2025

JEREMY C. DANIEL
United States District Judge